IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHERTOFF CAPITAL, LLC,        )
      Plaintiff,            )
                          )
      v.                   )        Civil Action No. 1:20-cv-0138
                          )
BRAES CAPITAL, LLC,          )
      Defendant.          )

## MEMORANDUM OPINION

This action alleging tortious interference with contract is before the Court on Defendant's Motion for Summary Judgment (Dkt. 60). Defendant's Motion has been fully briefed and argued by the parties at a hearing on October 29, 2021, and is therefore ripe for disposition. For the reasons that follow, the undisputed factual record makes clear that Plaintiff has failed to establish a valid claim for tortious interference with contract. Accordingly, summary judgment must be granted in Defendant's favor.

## I.

A grant of summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Rule 56(A), Fed. R. Civ. P. Because the summary judgment analysis requires examination of the undisputed record facts, Local Rule 56(B) directs a party seeking summary judgment to include in the summary judgment submission a specifically captioned section listing in enumerated paragraphs the material facts as to which the moving party contends no genuine dispute exists and to provide citations to the factual record supporting the listed facts. Local Rule 56(B) further instructs a party opposing summary judgment to address each enumerated undisputed fact and to state whether the fact is disputed or admitted and if disputed, to provide citations to admissible evidence in the record supporting the claim of a factual dispute

1

Defendant complied with Local Civil Rule 56(B) by setting forth a statement of undisputed material facts in separately numbered paragraphs. Plaintiff complied partially with Local Rule 56(B) by responding only to certain of the undisputed facts listed by Defendant and failing to respond at all to others. All of Defendant's undisputed facts to which Plaintiff did not respond must be deemed admitted. *See* Fed. R. Civ. P. 56(e); L. Civ. R. 56(B). Thus, the following facts are derived from the evidentiary record and the parties' compliance with Local Civil Rule 56(B).

- In 2009, Jason Syversen ("Syversen") founded the cybersecurity business Siege Technologies, LLC ("Siege") and thereafter served as the company's chief executive officer. In 2016, Syversen sold Siege to Nehemiah Security, LLC ("Nehemiah"). Following the sale, Syversen stayed on as CEO of Siege.

- In 2018, Nehemiah began to explore selling Siege. To that end, Nehemiah CEO Paul Farrell ("Farrell") approached Syversen to ascertain whether Syversen was interested in reacquiring Siege.

- Syversen was interested in the opportunity to reacquire Siege and established Rampart Holdings, LLC ("Rampart"), a limited liability company with Syversen as the sole member, as a special purpose entity through which to purchase Siege.

- After establishing Rampart, Syversen contracted with Plaintiff Chertoff Capital, LLC ("Plaintiff") to support the prospective acquisition. Specifically, on November 15, 2018, Plaintiff signed an engagement letter ("Engagement Letter") with Syversen and Rampart in which Plaintiff agreed to provide "investment banking advisory services" in support of a "potential management buyout [("MBO")] acquisition of Siege." Dkt. 61, Ex. 5.[1]

---

[1] The parties spill much ink debating the format of the acquisition contemplated by the Engagement Letter. In this regard, Plaintiff contends that the letter is ambiguous. Specifically, Plaintiff asserts that the language of the Engagement Letter *could* encompass multiple acquisition formats, including those in which Syversen would not retain his position as CEO of Siege, and that the Letter mentioned the MBO format only to offer one possibility. Defendant,

Plaintiff, Syversen, and Rampart were the only parties to the agreement.

- The Engagement Letter provided that Syversen and Rampart would pay Plaintiff the greater of 4% of the purchase price of Siege or $600,000 "[u]pon the successful closing of the acquisition." *Id.* The Letter further provided that it would:

  > remain in effect until the sooner of: (i) [Syversen and Rampart] decid[ing] not to move forward with the acquisition of [Siege]; (ii) the Closing; or, (iii) [a mutual agreement] to extend or terminate [the Engagement Letter by all parties].

  *Id.*

- On January 18, 2019, Syversen and fellow Siege executive Sam Corbitt ("Corbitt") submitted a letter of intent to Nehemiah stating that Syversen and Corbitt, through Rampart, sought to execute an MBO of Siege.

- On January 24, 2019, Rampart and Nehemiah entered into an exclusivity agreement in which Nehemiah agreed to negotiate only with Rampart regarding the sale of Siege through March 19, 2019. The parties later extended that deadline until April 15, 2019.

- As the prospective MBO moved forward, Plaintiff and Syversen worked together to create materials, including models and presentations, for potential investors.

- Syversen identified and reached out to two potential large investors for the acquisition: Three Kings Capital, LLC ("Three Kings") and Defendant Braes Capital, LLC ("Defendant"). Both firms expressed interest and submitted proposals to invest in the

---

by contrast, contends that Plaintiff agreed to support only the specific MBO acquisition ultimately pursued by Syversen and Rampart, *i.e.* a takeover in which Syversen and other Siege officers would retain their roles in the company's leadership. The ambiguity claimed by Plaintiff is no bar to summary judgment. First, because Plaintiff drafted the Engagement Letter, Virginia law makes clear that Plaintiff may not seek to benefit from ambiguity in the Letter's terms. *See Cent. Tel. Co. of Virginia v. Sprint Comm. Co. of Virginia*, 715 F.3d 501, 517 (4th Cir. 2013) (under Virginia law, a court must "construe any ambiguities in the contract against its draftsman") (citation omitted). Moreover, this dispute is immaterial to the summary judgment analysis. As discussed *infra*, regardless of the precise acquisition modes or formats encompassed by the Engagement Letter, the undisputed factual record contains no evidence to establish that Defendant caused a breach or termination of the Engagement Letter, whatever the mode of acquisition.

MBO. At this time, Defendant was aware that Syversen had contracted with Plaintiff for advising services, although Plaintiff did not furnish a copy of the Engagement Letter to Defendant.

- Syversen and Rampart chose to move forward with Three Kings rather than Defendant. Plaintiff notified Defendant that it had not been chosen by email on March 15, 2019. Defendant's principal Alex Clary ("Clary") responded to Plaintiff's email and indicated that, if the prospective MBO by Syversen fell through or failed, Defendant would be interested in purchasing Siege directly in a transaction "extraneous to Chertoff." Dkt. 61, Ex. 15. Plaintiff did not respond or object to this statement of interest.

- Clary also called Nehemiah's CEO Farrell and Vice President Hannah Clifford ("Clifford") and asked that Nehemiah keep Defendant in mind if Syversen's MBO did not ultimately proceed. Clary did not make an offer to purchase Siege during the phone call.

- Syversen and Rampart began to work towards an MBO with Three Kings as an investor. However, issues quickly arose. Most critically, Siege's chief technical officer, Joe Sharkey ("Sharkey"), grew reluctant to participate in the MBO and made demands that Syversen viewed as impossible to meet. Three Kings was hesitant to invest in the MBO without Sharkey's continued involvement in Siege.

- On April 2, 2019, Sharkey informed Siege executive Corbitt that he did not wish to proceed with the MBO. The next day, Corbitt emailed Three Kings, Nehemiah, and Syversen to state that, based on the conversation with Sharkey, it "[s]ounds like the MBO is dead." Dkt. 61, Ex. 21.

- Following receipt of Corbitt's email, Syversen emailed Plaintiff to say that, without Sharkey's involvement, "it's not tenable going forward on the current path." Dkt. 61, Ex.

22. Syversen further stated that unless Plaintiff had "a way to knock the price down a bunch ($2-3M) or find a similar person who could seamlessly take Joe [Sharkey]'s place we are out of ideas and think we need to halt pursuit of the Rampart MBO." *Id.* Plaintiff did not pursue a revised price from Nehemiah or seek a replacement for Sharkey.

- The same day, *i.e.* April 3, 2019, Syversen instructed Rampart's MBO attorney to cease all work on the planned acquisition of Siege. Additionally, Corbitt contacted Nehemiah to withdraw formally the MBO letter of intent and to release Nehemiah from the exclusivity agreement with Rampart.

- After withdrawal of the letter of intent, Syversen and Corbitt expressed some interest in pursuing a new MBO offer. For instance, on April 5, 2019, Corbitt emailed Plaintiff to state that Syversen was interested in pursuing yet another new offer through Rampart. Also on April 5, Syversen emailed Three Kings to initiate a conversation about "next steps." Dkt. 74, Ex. R. However, a new MBO offer by Rampart and Syversen never came to fruition, and Syversen resigned from his position as Siege's CEO on April 19, 2019.

- On April 4, 2019, following withdrawal of the Rampart letter of intent, Nehemiah Vice President Clifford contacted Defendant, informing Defendant that an opportunity to acquire Siege had become available owing to the withdrawal of the MBO offer and Nehemiah's release from the exclusivity agreement.

- Defendant agreed to pursue the opportunity and executed a final letter of intent to acquire Siege on April 11, 2019. On April 17, Nehemiah emailed Plaintiff to advise Plaintiff that Nehemiah was moving forward with an alternate plan for the sale of Siege, namely a sale to Defendant, in light of the withdrawal of the Rampart letter of intent.

- After agreeing to pursue the acquisition of Siege, Defendant communicated with Siege's

the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

To establish a claim for tortious interference with contract under Virginia law, Plaintiff must prove:

> (1) the existence of a valid contractual relationship . . .; (2) knowledge of the relationship . . . on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship . . . ; and (4) resultant damage to the party whose relationship . . . has been disrupted.

*Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (2014) (citation omitted). Additionally, it is important to note that the parties agree that the Engagement Letter was terminable at will by Syversen and Rampart, who were free to decide against pursuing the acquisition of Siege at any time. This is significant because Virginia law requires that when a plaintiff alleges tortious interference with a contract terminable at will, the plaintiff must prove that the defendant interfered by using "improper methods."  *Duggin v. Adams*, 234 Va. 221, 227 (1987). This requirement stems from the fact that "the cause of action for interference with contractual rights provides no protection from the *mere* intentional interference with a contract terminable at will." *Id.* at 226 (emphasis added). Improper methods of interference with contract under Virginia law include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* at 227. The undisputed factual record in this matter offers little support for Plaintiff's claim that Defendant employed any such improper methods of interference and, more importantly, the record also makes clear that Defendant did not induce or cause a breach or termination of the Engagement Letter.

Importantly, Plaintiff may not argue in this action that any breach of the Engagement Letter by Syversen and Rampart actually occurred. In this regard, it is important to review the procedural

history of this case. Notably, Plaintiff's Complaint, as originally filed, included both a breach of contract claim against Syversen and Rampart and a tortious interference claim against Defendant Braes Capital. Specifically, Plaintiff alleged that Syversen and Rampart breached the Engagement Letter by failing to consummate the acquisition of Siege with Plaintiff as the exclusive investment banking advisor, and further alleged that Braes tortiously interfered by "induc[ing] Mr. Syversen to breach the [Engagement Letter]." Dkt. 1 at 8. In light of a binding forum selection clause in the Engagement Letter, the breach of contract claim against Syversen and Rampart was severed from the tortious interference claim against Defendant and transferred to the United States District Court for the District of Delaware. *See Chertoff Cap., LLC v. Syversen*, No. 1:20-cv-138 (E.D. Va. Apr. 27, 2021).

It now appears that, following transfer, a federal district court in Delaware has resolved Plaintiff's breach of contract claim against Syversen and Rampart, granting summary judgment in favor of Syversen and Rampart. *See Chertoff Cap., LLC v. Syversen*, No. 1:21-cv-591, 2022 WL 1120097 (D. Del. Apr. 14, 2022). Specifically, the Delaware court found nothing in the evidentiary record to support the claim that Syversen and Rampart breached the Engagement Letter. The Delaware court first observed that the contract between Plaintiff and Syversen/Rampart "was rescinded prior to Braes Capital's purchase of Siege," and thus Braes's acquisition of Siege could not be construed as giving rise to a breach of the Engagement Letter. *Id*. at *5. The Delaware court further noted that the Engagement Letter appeared to contemplate an acquisition by Rampart through an MBO, and any ambiguity on that point was attributable to Plaintiff as the drafter. *Id*. at *6. As a result, because Defendant's deal to acquire Siege did not constitute an MBO, the sale of Siege to Defendant did not trigger the duty of Syversen and Rampart to pay Plaintiff under the Engagement Letter. *Id*. The electronic docket discloses that no appeal was noted by Plaintiff within

the thirty-day limit set forth by Rule 4, Fed. R. App. P. Thus, the Delaware court's order represents a final disposition of Plaintiff's claim against Syversen and Rampart and is therefore *res judicata* with respect to Plaintiff. Accordingly, under Virginia law, Plaintiff is now precluded from contending that Syversen and Rampart breached the Engagement Letter, and thus may not argue in this case that Defendant induced a breach of that contract.[3]

The Delaware court's final judgment in favor of Syversen and Rampart and against Plaintiff is important to the disposition of Plaintiff's claim against Defendant. However, as Plaintiff points out, a finding that Syversen and Rampart did not breach the contract is not automatically fatal to Plaintiff's tortious interference claim. Under Virginia law, a defendant may be found liable for tortious interference if, *inter alia*, the defendant "induc[es] or caus[es] a breach *or termination* of the [contractual] relationship." *Dunlap,* 287 Va. at 216 (emphasis added). In other words, even if Syversen and Rampart did not breach the agreement, Plaintiff may still contend that Defendant wrongfully procured termination of the Engagement Letter. However, Plaintiff's claim nonetheless fails because the undisputed factual record squarely rebuts the contention that Defendant induced or caused the termination of the contractual relationship between Plaintiff and Syversen/Rampart. Specifically, the undisputed factual record discloses that: (i) the Engagement Letter was terminated prior to Defendant's efforts to acquire Siege and (ii) regardless of the date of termination of the Engagement Letter, Syversen and Rampart's offer to acquire Siege failed for reasons wholly unconnected to any actions by Defendant.

---

[3] Under Virginia law, the doctrine of issue preclusion bars "parties to the first action . . . from litigating in a subsequent suit any issue of fact actually litigated and essential to a valid and final personal judgment in the first action." *Funny Guy, LLC v. Lecego, LLC*, 293 Va. 135, 142 (2017). Here, there can be no dispute that: (i) Plaintiff was a party to the Delaware action, (ii) the factual issue of whether Syversen and Rampart breached the Engagement Letter was the central issue of the Delaware action, (iii) the parties actually litigated that issue at the summary judgment stage, and (iv) the Delaware court's determination that there was no breach was essential to the entry of a valid final judgment in that case. Accordingly, Plaintiff is precluded from relitigating in this case the issue of whether there was a breach of the Engagement Letter as alleged in the Complaint.

With respect to the first point, the record makes clear that the agreement between Plaintiff and Syversen/Rampart had already been terminated by the time Defendant stepped in to pursue its own acquisition of Siege. The Engagement Letter provided, in pertinent part, that it would remain in effect until Syversen and Rampart "decide[d] not to move forward with the acquisition of [Siege]." Dkt. 61, Ex. 5. Syversen provided notice to that effect in an April 3, 2019 email to Plaintiff, in which Syversen stated that "we need to halt pursuit of the Rampart MBO." Dkt. 61, Ex. 22. It was only after that date that Nehemiah reached out to Defendant to pursue an alternative deal for the sale of Siege. Moreover, the parties agree that the Engagement Letter was terminable at will by Syversen and Rampart, and thus Plaintiff must show that Defendant procured termination of the contract through "improper methods." *Duggin*, 234 Va. at 227. As noted, the record appears devoid of any clear indication that Defendant employed improper methods in pursuing an acquisition of Siege. But, more importantly, any alleged misconduct by Defendant, such as Defendant's alleged misappropriation of Plaintiff's investor models and presentations, clearly postdated April 3, 2019.[4]

Plaintiff's arguments to the contrary are not persuasive. Plaintiff contends, for example, that the Engagement Letter was not terminated until Syversen sent a written "formal reminder" of termination on May 20, 2019. Dkt. 61, Ex. 3. But the Engagement Letter did not require a formal recission; rather, the contract terminated at the sooner of: (i) the closing of the acquisition, (ii) mutual agreement of the parties, *or* (iii) Syversen and Rampart "decid[ing] not to move forward

---

[4] Plaintiff identifies only one act of interference by Defendant that predates April 3, 2019, namely the March 15 phone call between Defendant's principal Clary and Nehemiah's CEO and Vice President. In that call, Clary did not offer to purchase Siege, but stated only that Defendant would be interested in pursuing an acquisition of Siege if the Rampart deal fell through. Put simply, there is no colorable argument to support the contention that this call constituted "improper" interference with contract. At most, Clary's call represented a tentative step towards supplanting a party to an at-will contract. But as the Supreme Court of Virginia has made clear, "the cause of action for interference with contractual rights provides no protection from the mere intentional interference with a contract terminable at will." *Duggin*, 234 Va. at 226. That is so because "an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain, and he has no legal assurance that he will realize the expected gain." *Id.*

with the acquisition." Dkt. 61, Ex. 5. As stated *supra*, it is clear that Syversen and Rampart had decided not to move forward as of April 3, 2019, when the MBO offer was withdrawn. Plaintiff resists this conclusion, noting that Syversen exchanged emails with Plaintiff and Three Kings after April 3 which expressed some interest in putting together a new offer to buy Siege. However, Plaintiff fails to adduce any evidence that these emails resulted in any meaningful progress towards a new offer by Syversen and Rampart, and indeed no new offer was ever issued. Put simply, the deal that Plaintiff contracted to assist, namely Syversen and Rampart's acquisition of Siege, failed as of April 3, 2019 and was never thereafter revived.

Finally, even assuming *arguendo* that the Engagement Letter was not terminated until May 20, 2019, Plaintiff's claim still fails. Regardless of when Syversen and Rampart's contractual obligations formally ceased, the undisputed factual record makes clear that the Syversen/Rampart acquisition failed for reasons entirely extraneous to Defendant's alleged interference. Specifically, as the record discloses, Syversen and Rampart relied on Three Kings to back the acquisition as a major investor, and Three Kings expressed reluctance to invest when Siege CTO Sharkey declined to participate in the MBO. As a result, Syversen withdrew the MBO offer and released Nehemiah from its exclusivity agreement. Conspicuously absent from this chain of events is any interference by Defendant; indeed, Defendant only began to actively pursue an acquisition of Siege when Nehemiah reached out following Syversen's withdrawal.[5] Ultimately, Plaintiff did not receive payment under the Engagement Letter because Syversen and Rampart did not acquire Siege, and

---

[5] Even assuming that Defendant had engaged in misconduct when it began to pursue the acquisition of Siege, such as by misappropriating Plaintiff's proprietary work product, the record does not support an inference that that misconduct caused the failure of the Syversen/Rampart acquisition. As noted, that alleged misconduct postdates the April 3 withdrawal of the MBO. Following withdrawal, Plaintiff, Three Kings, and Syversen made no progress towards a new offer than tentative emails and never issued an updated offer. At the same time, Siege's seller, Nehemiah, had been released from its exclusivity agreement with Syversen/Rampart and was plainly interested in courting other sellers. Plaintiff cannot reasonably argue, on this record, that Rampart would have successfully acquired Siege but for Defendant's purported misappropriation.

Syversen and Rampart's offer to acquire Siege failed for reasons wholly unconnected to any actions by Defendant. Accordingly, the evidentiary record simply does not support an inference that Defendant "induc[ed] or caus[ed] a breach or termination of the relationship" between Plaintiff and Syversen/Rampart. *Dunlap,* 287 Va. at 216.

In closing, it is worth emphasizing that, under the terms of the Engagement Letter, Plaintiff would receive payment for its services only if Syversen and Rampart successfully acquired Siege, and Syversen and Rampart were free to walk away from the acquisition at any time. Accordingly, the Engagement Letter entailed a substantial risk that Plaintiff would not receive payment for its services. Plaintiff's contractual risk ultimately materialized: the Syversen/Rampart MBO failed, and Plaintiff received no payment. In essence, this action seeks, inappropriately, to convert Defendant into an *ex-post* insurer for the risk that Plaintiff willingly assumed. But because Plaintiff has failed to offer any proof that Defendant caused a breach or termination of the contractual relationship between Plaintiff and Syversen/Rampart, summary judgment must be granted in Defendant's favor.

### III.

Accordingly, for reasons stated in this Memorandum Opinion, Defendant's Motion for Summary Judgment must be granted. An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
May 27, 2022

T. S. Ellis, III
United States District Judge